...is in the case of Shenoy v. Charlotte-Mecklenburg Hospital Authority. We'll let council get ready. When you are ready, Mr. Pratt. Take a minute if you need it. We called you kind of quick, but just when you're ready. Thank you, Jeff. May it please the court. My name is Mark Pratt of the North Carolina Bar, and I represent Dr. Vital Shenoy. If I may, Your Honor, I'd like to reserve seven minutes of my time for rebuttal. At the outset, I'd like to focus on the constitutional question presented in this case. This is a First Amendment case analyzed under the public employee speech rubric. My client, Dr. Vital Shenoy, is a pathologist who was employed by CPG, a pathology group, that was in turn an independent contractor of one of the largest public hospital systems in the country. The speech in question involved Dr. Shenoy's concern that the hospital administration had failed to do its part to address a rash of wrong site or wrong patient surgeries. Let me be clear about what we're talking about here. Surgeries at a public hospital were being performed on the wrong patients or the wrong body parts. This was speech concerning a matter of public concern that the First Amendment protects. Doctors are, as a class, members of a community, most likely to have informed and definite opinions as to how resources need to be allocated within hospitals to ensure quality medical care. Accordingly, it's essential that they be able to speak out freely on such questions without fear of retaliatory dismissal. Dr. Shenoy had a right as an independent contractor, an independent medical professional, to be free from retaliation for expressing his view that the administration had a role to play in participating in solving the problem of wrong person, wrong site surgeries in a public hospital. Now, procedurally, this case comes before the court on appeal from an order granting a summary judgment in favor of the defendants. In that order, the district court decided that Dr. Shenoy's medical peer review speech was made as part of his official duty and therefore was not protected by the First Amendment in light of Garcetti. But this court in Andrew v. Clark made clear that the official duty question is a question of fact. The district court failed to recognize that the record here is replete with material factual disputes bearing on the nature and scope of Dr. Shenoy's official duty as an independent contractor working at a public hospital. At the summary judgment stage, of course, all of the disputed facts must be viewed in the light most favorable to Dr. Shenoy. In rejecting Dr. Shenoy's retaliation claim at the first step in the constitutional analysis in an oral ruling made from the bench at the end of a hearing, the district court applied Garcetti in an overly mechanistic way, reading it as a checklist requirement for First Amendment protection to attach. With respect, the approach taken by the trial court misapprehends Garcetti. In Garcetti, the court itself disclaimed any intent, and I quote, to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there's room for serious debate, close quote. And that was true because in Garcetti, the employee, not an independent contractor as here, the employee in that case conceded that the speech at issue was made as part of his official duties. Garcetti and Pickering, the foundation upon which all public employee free speech jurisprudence is based, require the district court to do what it did not do here, to undertake a practical. Was he speaking in this instance as an employee or as a concerned citizen, and how do we decide that? No, Your Honor, he was speaking, and for First Amendment purposes, he was speaking as an independent contractor, not an employee. I mean for First Amendment purposes. For First Amendment purposes, he was speaking as a citizen, and as any other citizen would. I think it's important in answering your question, which is a very important question, to understand the milieu of a hospital. Doctors, doctor, administers. Does an independent contractor take on any role in this setting of an employee-type speech, or is it always necessarily citizen speech? In other words, do you see, I guess another way to say it is, do you think the official title of employee is necessary to drop someone into unprotected speech versus being a citizen, but everybody's a citizen largely. Well, I think when you go back to Pickering, it's clear that one can be an employee and still have First Amendment protracted speech rights. So here I guess I would say in answer to Your Honor's question that it really doesn't matter, and it would be possible for that to go either way. Well, it matters to me, so I'm going to ask you another way. Okay. But an employee, while he may sustain certain rights and be protected, oftentimes the status of employee causes the loss of certain rights, correct? That's true. And so I'm trying to figure out in this case, where do we draw the line, which I'm sure is the line you want us to draw too, as to his function, whether or not calling him . . . Everything he says is protected. No, not if it was within his duty that had been defined. But that we would contend is not the case here. Can you accept a duty that's akin to a duty of employment of volunteering to work on something that is employment-related? I don't think you can. I mean, you can't in one duty. I don't think you can for the First Amendment purposes we're talking about here. And in any event, Your Honor, I would say that that is a, as I was saying, it's a practical, nuanced, fact-dependent review of the record facts that bear on that question. And that's for the jury. Let me say this. Because something that's fact-dependent does not mean it goes to the jury. Well . . . We'll get that straight. It's not true. We decide to question the facts. A question of facts can be decided as a matter of law all the time. I understand, Your Honor. I'm talking about a genuine issue of disputed material facts. I know that's what you're suggesting that we have here. And I certainly understand that's your argument. But if we have an independent contractor who takes on the role that would normally . . . Is this a review board? Is that a public forum comment on the hospital operation? No, Your Honor. But . . . No, Your Honor. But you have to understand the hospital milieu. The Quality Control Committee also handles peer review speech. Do they have . . . And . . . Do they have . . . Do hospitals . . . I'm just wondering anything in the record that a hospital here gets any input from citizens. I say hospital. I mean the medical practice. Whatever that enterprise is in this case. They get input from the public on what they do and they hear complaints and all that. Do they have some function or form for that? People complain to hospitals all the time. And I would contend, Your Honor, that for constitutional purposes, the speech the doctor made here in that setting and in that context was akin . . . He did just what any citizen would do. Only problem was that he was working there. That's the problem. Well, but the fact that you're working there is different, I would tell you and assert to you. In an independent contractor setting, we know . . . That's what I'm saying. . . . that employers and employees . . . That's what I'm saying. Let me finish. Sure. That's what we have to do with this. I understand. When you say something, I know you want to say a lot, but you're making me think of points to follow your argument. And I have to decide the case, at least one of the three. But the point is . . . So then you say an independent contractor somehow that shifts . . . It can't take on, for First Amendment purposes, those restrictions that might apply to employees. Well, it's not quite the same as an employee. Here's why. I didn't . . . Did my question say it was the same? I didn't say it was the same. I said you say that an independent contractor cannot take on some of the restrictions that apply to employees. That's what I said. I didn't say . . . Well . . . You didn't become an employee. An independent contractor can, of course, do work that is asked by the contracting party, right? But we know from tax law and employment law that independent contractors differ in significant legally distinguishable ways. One of the ways . . . Let me just say this. If you want to answer . . . I don't want to take any more of your time. If you want to continue along those lines and answer that, since I asked you, you can. If you want to make some other points, you can, too. I don't want to make you take all your time on that. I want to make sure I answer your question. And I guess what I'm trying to say is the difference for the First Amendment purposes that Your Honor must decide, the difference between an independent contractor and an employee is one of control. And in the hospital milieu, as Your Honor is quite familiar, I'm sure, an employer-employee relationship is one with absolute control and direction. An independent contractor relationship is one in which the independent contractor uses his own discretion and direction as how to do certain things. Would your client have even been allowed in this meeting unless he were working there as a doctor? Would he even have been able to get in the meeting? Oh, no, of course not. Of course not, because there are certain . . . Would he have been allowed to speak if he hadn't been working there? No, of course not. So any speech that he made there was a result of the fact that he worked there. The knowledge and information in the speech that he made there was really of two pieces. First, he was criticizing the roles of the doctors. Nobody asked you, though. He said basically he wouldn't be there to even talk in the first instance if he'd not been working there. But that's true, and I agree with him. And the point is, though, that he then went on to do something that had to do with other than medical peer review. It had to do with taking a look at a comprehensive way of solving a problem. People bringing people into the wrong operating rooms or moving them around so the wrong people are being cut on. That doesn't involve as much the doctors as it also involves the staff and the administration. That sounds like work to me. You're doing your work wrong. Why isn't that work? But, Your Honor, with respect, with respect, what he was commenting on is the need for somebody didn't supervise him. He was giving comment about something he doesn't get paid to do. He doesn't get evaluated to run the hospital or tell them how. But he was in a position to try to suggest the solution. What about under First Amendment analysis when you have clearly an employee, clearly an employee, and then an employee is speaking, but an employee is speaking out about something that is work-related but they don't get paid to do? Well, that's pickering. That's the high school principal who writes or teacher who writes the letter to the editor. No, no, no. That's one example of it. What about the person who is an employee who complains about, constantly complains about the wrong kind of potato chips? Well, now, that's a different case, Your Honor, for sure. That is just an employee dispute and, you know, sidebar stuff. This Court has decided many cases. I know. That's what I'm saying. So it may be how you characterize what a person is saying and how it's related to what they do and the core of what they're doing and their role that may make some difference in this analysis. Well, it certainly does, but I would tell the Court that we need to look at the nature of the speech and what it was about. And what it was about was something the doctor is not required to do, just like the high school teacher in pickering wasn't required to do, just like the speaker, the college professor in Adams wasn't required to do. And here, the doctor, your client, wrote a letter to the Charlotte Observer saying there are problems at the hospital. Well, he couldn't do that. His obligations as a doctor and an independent contractor and a member of the peer review wouldn't allow him that approach. That might indicate, then, his comments are within the context more akin to what an employee does than citizen complaints. But with respect, Your Honor, in Givhan, the Supreme Court of the United States held that that was not so. When the teacher went up the chain and spoke to the principal about a racial discrimination problem, the Supreme Court said the fact that you didn't go to the newspaper is not the problem. It's the speech and the nature of what it's about. Didn't the senators in Garcetti make all the points you're making and the majority had a chance to read them and rejected them? I would say, with respect, Your Honor, no. What happened in Garcetti was they were dealing with a specific situation in Garcetti. It was stipulated that the work the lawyer in that case was doing was part of his official duty. That's the issue in this case. One of the things you said that's interesting to me, and I ask you just to expound on it just a little bit, it seems to me that the fact he was not allowed to speak privately about this cuts against you, but in a policy sense could cut in your favor in arguing there was no opportunity for private speech and public speech, which doesn't allow the opportunity for private speech, with regard to matters of critical health and safety should be treated differently. I see my time's up. May I respond, Your Honor? You can respond quickly or else you may take time off rebuttal. I think it is important to note that when you move towards a policy question, surely this speech here about how we are to resolve the problem that requires all team members to participate in resolving wrong site surgeries in a public hospital is at least as important as some of the speech that's been protected by the Supreme Court and by this Court in other cases. And if I might, Your Honor, just use a little of my time for rebuttal. Let me make one point, not about the constitutional claim, but about our interference with contract claim, which I think is quite important, and I just want to call the Court's attention to this because it has to do, as I said, with our state law tortious interference claim. The hospital has said repeatedly in this case, and they sold the district court on this notion, that its contract with the pathology group, the group of physicians that employ Dr. Shinoy, who created the independent contractor relationship, gave it an absolute right to demand the removal of Dr. Shinoy. And they cite paragraph 3F of the contract, which is in the joint appendix at page 861. I would ask the Court to look carefully at the language of that paragraph. In fact, what it says is that for the reasons detailed in paragraphs 3A and E, the hospital could demand removal, but not under 3F, which is the reason they terminated my client from his employment. If paragraph 3F is at issue here, and the Court reviews that carefully, you'll see that the hospital must give the pathology group notice and an opportunity to cure any purported problem in Dr. Shinoy's performance of his administrative duties, and that did not happen here. So any claim that the hospital had an absolute right to call for Dr. Shinoy's termination is a canard. It's a false as a matter of fact and as a matter of law. And this case needs to be reversed and remanded for trial. Thank you. Thank you very much. Mr. Johnson. Thank you, Your Honor. May it please the Court, I'll speak on behalf of the Carolinas Healthcare System defendants. Bill Sturgis will speak on behalf of the defendant Carolinas Pathology Group. In his argument and briefs, Dr. Shinoy ignores the applicable precedent, namely the holding in Garcetti and the facts of Garcetti. You might have to pull that microphone a little bit closer to the kids. Thank you. Dr. Shinoy ignores both the holding in Garcetti and the facts in Garcetti. And with reference to that case and the reference to the record in the instant case, it becomes clear that Garcetti controls the outcome of this case. That's what the trial court determined in granting the motion for summary judgment, and we submit that this court should affirm the ruling on the basis of Garcetti alone. There are other reasons we've cited in the brief as well that would support the entry of summary judgment in this case. With respect to Garcetti, it's clear from the record evidence in the case that at all times relevant to the allegations of Dr. Shinoy, he was acting in the course of his duties as the chair of the Medical Staff Quality Improvement Committee at Carolinas Medical Center Mercy. It wasn't just a matter of who his employer was, although the fact is he was an independent contractor at the hospital with duties to the hospital as well as to his actual employer, Carolinas Pathology Group. He had duties that are spelled out in the bylaws of the hospital that related specifically to the service he performed on the Medical Staff Quality Improvement Committee. Is everything he says sitting there covered by Garcetti? Is everything he would say sitting there in that capacity covered by Garcetti? Everything that he says related to any of the functions of that committee, which include assessing the quality of medical services at the hospital and reviewing the quality of physicians who practice at the hospital and providing peer review to the physician. Why could he say that in any way touched on the operation of the hospital that wouldn't be protected? The functions of that committee are substantial. They involve the provision . . . You don't answer my question. Okay. Is there anything? Very little and not anything that I can think of, Your Honor. Okay. Given the context of the meeting, a closed meeting of the Medical Staff Quality Improvement Committee . . . Let me ask you this. You think maybe if it was just small talk or something like that and somebody was displeased with that and wanted to take action that he might have some protection then? That's possible. Only small talk unrelated to the hospital or something like that? It's possible that would not fall within the official duties language of Garcetti. You're not even giving on that point. You're not even giving on that. I think that's covered too. I mean . . . Let me say there could be small talk that would not be covered by the official duties provision of Garcetti, but it also would not raise an issue of public concern most likely if it were just small talk. Well, it might or might not. It might be small talk like this. Man, I really like the way the election turned out. Guess what? You're going. I wouldn't call that small talk, Your Honor, but it's possible, yes, there could be talk at a meeting that would not fall. I like the way . . . I like who got elected to be mayor of Charlotte. I mean, you could think of something that touches on what looks like pretty hardcore free speech right. It's not like, gosh, you know, I hate coming here. I hate getting up so early in the morning. I mean, I'm just trying to find out where you draw that line. I understand your distinction. You say under Garcetti, if he's there because of work, if it's work-related, if the audience is really the chain of command to effect something about work, that's not First Amendment-type citizen speech. That is not citizen speech, Your Honor. I'm just saying where you saw the boundary was. Okay. Yeah, I agree. Your example could fall outside that. What do we do with somebody here who's not an employee? If we take that he's not an employee, what about that? Well, this court has addressed that issue in the Braswell case, and it's applied the same standard to independent contractors and their medical staff privileges at hospitals as it does to employees. I submit this court has decided that issue. Other courts have addressed that issue, and the independent contractor status of a physician at a hospital with medical staff privileges is every bit as deserving of the Garcetti analysis. You think it puts that person, and you think the court thinks it puts that person, whatever the title, in the same position. They're in there talking about work-related matters. It puts that person in an identical position of an employee, and indeed the duties of a physician within a hospital, not only are they akin to those of an employee, but the duties of Dr. Chenoy as the chair of the Medical Staff Quality Improvement Committee are . . . What are we to do with the fact, what we hear counsel argue, that, yeah, he has responsibilities in that committee to talk about some things, but who the heck is going to talk about the wrong patients and the wrong body parts being operated on, and why isn't that something that we should offer some kind of protection to, because people go in hospitals. I mean, the hospital treats the public. Why isn't that somehow imbued with some kind of public interest that ought to be protected? I submit, or I agree, that a statement about wrong site or wrong patient surgeries in a hospital is likely to be deserving, is likely to be a matter of public concern. Nonetheless . . . Especially for that small part of the public that's on the table. Very much so, very much so, Your Honor, and a matter of concern to all patients and potential patients at any public hospital. But that doesn't escape the fact that the comments made by Dr. Chenoy at this committee meeting were in the course of his official duties. Does it matter at all? Again, this is my speculative question. Does it matter at all that his free speech rights are completely prohibited? That is, he can't speak as a private actor for the very reason that he is speaking as an employee or independent contractor. I would disagree that he could not speak as a private actor. I thought he was forbidden to talk about anything that happened in those meetings. He is forbidden to talk about specific cases. That's true. Those are confidential. He could not talk about somebody having the wrong leg cut off. He could not disclose material learned specifically in that meeting confidentially, publicly. That's true. He learned it and was telling it to them and criticizing them and even yelling at them about it, saying you all are cutting off too many wrong legs. Well, I would submit that is actually not the record testimony. He yelled at them and said other things. I'm not suggesting it is. I'm saying does it make any difference in the legal analysis that if we construe what he says as an independent contractor, as, quote, employee speech and therefore offered no First Amendment protection, does it make any difference that he is also, by your rules, by a public body, by state action, prohibited from making any private comment about it? It does not, Your Honor. I thought that was your answer. However, if Dr. Shinoy had concerns, if indeed it were really his concerns about patient safety that were driving his conduct at the Medical Staff Quality Improvement Committee meeting, Dr. Shinoy had ample opportunity to raise issues about the qualifications of the administrators of the hospital or the process in multiple public forums. He could have written a letter to the newspaper. He did not. He could have attended a board meeting of the commissioners of the hospital and raised any and all concerns there. He did not. What Dr. Shinoy chose to do was to personally attack in an outburst that others called a tantrum or an outburst or... Is it your position that if he had information that he carried with him to the meeting that he could have disclosed that information otherwise? He could not disclose specific information relating to specific physicians and their care, but if he had criticisms of management, which is what he claims... Could he disclose the fact that you're cutting off the wrong legs on dozens of patients that he knew as a personal matter to be the case? Well, first I submit there's no evidence to the effect. I understand that, and that's why I used an exaggerated example. But I believe, yes, he could make the statement that you made as a public matter. He could have written it to the newspaper. He could have written it to... Because otherwise your argument is that rights he would probably otherwise have he would give up independent of being on that board. And we don't argue that. There's a confidentiality about specific cases and names and patients. There's not a confidentiality about any legitimate concerns. Your position is information that he otherwise could have stated publicly, and presumably there is some universe of that information, that by his service on this board he doesn't give up that right independent of the board. There are other restrictions. There are restrictions, you say, that go with being on this board. And you say that's the information and his conduct for which he was punished, that conduct. The conduct that received the attention. Yes. The conduct that he received the attention for that ultimately Carolina's health care system requested his removal from his position for related to the specific duties that he had on the board, namely patient issues and quality of medical care in the hospital. Didn't he get dismissed for his conduct at that meeting? He was dismissed for a pattern of conduct culminating in the tantrum that he threw at that meeting and one meeting thereafter, a March 9th meeting of the quality. There's a record indicating he would have been dismissed had he not put on that tantrum or whatever at that meeting. It does not. Right. It does not. And, in fact, in the letter from Curtis Copenhaver, the hospital administrator. Do you want to, maybe you want to talk about that more. Do you want to talk about that inefficient, I mean, inefficient or interference with contract rather, the interference with contract claim 3F and all that? Let me address that. Is that not for you? Is that for the other lawyer? Who's that for? I'll take that, Your Honor, and let me address that since you've asked. With respect to the North Carolina claim for tortious interference with contract, first we submit that that claim was failed for the same reasons the First Amendment claim fails, that the hospital, that there was justification for the hospital's action. Second, there was indeed an absolute right of the hospital authority under the contract to insist on a medical director satisfactory to the hospital. That's the contract language that we submitted as pertinent here, and it is, I can't cite the paragraph of the contract, but we quote it in the brief. The contract provides that it is the prerogative of Carolina's health care system to insist on a medical director it finds satisfactory. Under that contract, it could request at any time the removal of a director, which it did. It did not, I point out, request Dr. Chenoy's termination from employment, but rather it merely exercised its contractual right for removal of the director. Do you have to have the absolute rights rule to win here? We do not, Your Honor. Why don't you? Because the conduct of the hospital was absolutely justified under these circumstances. Didn't Dr. Chenoy say he was respectful at the two meetings? Dr. Chenoy may have said that in some conclusory fashion in his two days of deposition and 30-page affidavit, but he— How else is he supposed to say that? He testified specifically. Are you suggesting that, notwithstanding the fact he says he was respectful, that the facts on the record of how he conducted himself doesn't support that conclusion? That's correct, Your Honor. That conclusory allegation is belied by Dr. Chenoy's own testimony. In deposition, he said he repeatedly reprimanded the officials at the hospital where he worked. In fact, he went on to say, yes, it was like a 10-minute bully pulpit in which he not only reprimanded them but denounced them and threatened them. I don't want to take the last of your time on just that point, but I do want to ask you, anything else you want to add on your argument? Your Honor, I would add the fact that not only does Garcetti compel summary judgment because this was speech, if it was speech at all, that occurred in the course of official duties, but furthermore, that under any analysis of the First Amendment as applied by the U.S. Supreme Court or this Court, Dr. Chenoy's claims must fail. First of all, he did not engage in protective speech, notwithstanding his conclusory contentions. If you look at the record in the case, you see what he did was denounce, reprimand his superiors. And the courts have held, including in particular the very opposite case of Smith v. Cleburne Hospital, that such denouncing of one's superiors, hospital administrators, does not warrant First Amendment protection. In addition, Dr. Chenoy has failed to show that his interest in denouncing administrators outweighs that of the hospital in efficient and collegial workplace, as this Court has noted in the Braswell case. And finally, he has failed to establish the elements of causation. The District Court could have relied on any of those aspects in support of its award of summary judgment. In employing the analysis under Garcetti, it determined, as a matter of law, that Dr. Chenoy's conduct occurred in the course of his official duties, and it was entitled there to stop his inquiry, which it did. For all those reasons, we ask that this Court approve the ruling of summary judgment in favor of the Carolinas Health Care System defendants on both the First Amendment claim and on the claim for tortious interference. Let me ask you this question. As to the tortious interference, the dismissal was under the outright section as opposed to the course of action recommendation. Is that true? I'm sorry, Your Honor. The dismissal was under the which section? There's a dismissal provision. There are times when you can outright dismiss, and then there's a course of action recommendation. In this case, it seems to me that it was an outright. You relied on the outright section as opposed to the course of action. That's correct, Your Honor. Is that correct? Yes, Your Honor. I mean, is that the correct action? Is that correct action? We believe it is, Your Honor, for all the reasons that we've cited, both in the brief and otherwise. Ultimately, the control of this position was within the prerogative of the hospital. It was entitled to insist on an individual satisfactory to itself. Thank you, Your Honor. Thank you very much. Mr. Sturgis? Good morning. I represent Carolina Pathology Group, CPG. I want to address two points. One, there is lack, and I've got to address the Fear of False Claims Act. That's the only remaining claim against CPG. I want to address the causation element of that, and I want to address the protected activity nature of that. District Court primarily focused on the causation and said there was no causation. There was clearly no direct evidence, so Chenoy used to try to use the temporal proximity argument for that. The problem is that Chenoy used the wrong dates. Dates are important when you get the temporal proximity. The date that Chenoy was given notice, six months' notice of his termination, was April 5th. He was not terminated until October 27, 2005. He was paid a six-month salary during that time period. The date Chenoy used as a temporal connection is February 2005, and that's when the OIG said you're dismissing your claim. But there's nothing unique or special about that date. There's no information that CPG got some sort of special knowledge that he was to be later on that date. The more important date is February 2004. That's when the OIG advised CPG that it was investigating matters. So at that point, that was CPG's first knowledge of, quote, an investigation. Actually, this false claim allegation surfaced in 1999, didn't it? Very good. Actually, back to 1997. That was six years. Exactly. And what Chenoy claims is that in 2004, he doesn't say it this way, but he says in February 2004 when the complaint became, you know, you were known about it, you knew it was me because of events in 1997 when he made a corporate compliance complaint and events in 1998 and 2000 when he talked to other doctors who were not on the board and made vague comments about complaints. And so the temporal relationship argument just totally falls apart. All the cases cited by Dr. Chenoy don't even say 12 months, which would be the shortest temporal relationship. According to some of Chenoy's argument, it's almost six or seven years of notice. So there's no close temporal relationship. Also, the district court found there's a very legitimate reason for termination. As you've heard, CMC, the hospital, requested that he be removed from the position. Actually, Carolina Pathology Group tried to find another place for him, but Chenoy demanded that he have special treatment, that he have his own special office, that he receive special equipment, and that he had to be on the committees at the other hospitals where CPG had contract, which the hospital said they would not. They were left with no alternative. They gave him the right. They terminated without cause. It's also suspect when you get into retaliation when a person says, oh, the reason I was fired was because of a First Amendment claim and claiming about people cutting the legs off in the hospital, killing people, and then he comes back and says, oh, no, it's not. It's because I was the relator. So you run into that problem. Protected activity, the Mann case of this court is completely on point and completely destroys this case. Chenoy complained about three things, timeliness of autopsies, time studies, and billing for certain stains. The autopsies, whether they were untimely or not, is irrelevant. When the government got billed for them, they were done. To have a false claim act, you have to have a claim on the FISC or fraud. The time studies, there were no charges to the government related to time studies. That's the uncontested evidence. The government just collected information, no claim on the FISC. The stains and the billing where Chenoy tried to make the most claim, and he gave one example. It dealt with an ABS, PAS stain and an Alcon Blue PS stain. And what CPG did is it made one charge for the technical working on the slide, and it made two professional charges for the code. Chenoy believed there should only be one professional charge on the code, and therefore he said that was fraud. But CPG submitted its bills and showed it was charging two codes. Thus, there's no misrepresentation. Thus, there's no fraud. Also, CPG, as to other pathologies, consult professionals about billing codes. The professional told them that two codes, professional codes, was proper. So there was nothing knowingly false done by CPG. We simply have a disagreement by Dr. Chenoy as to how certain codes should be billed, and that does not rise the level of protected activity. So I believe the Mann case, which the district court really did not look at very carefully, shows that that is another reason that Chenoy's claim should be dismissed. He never engaged in any protected conduct. He has failed to show causation. He's failed to rebut in any way that there was a legitimate basis for his termination. Any questions? Thank you very much. Sorry I talk so fast. Five minutes goes fast. Sometimes not fast enough. Thank you very much, Mr. Pratt. Well, you would think my guy was just a terrible guy to get all the hospital fellows all riled up like that. Let me just say that it would not be unknown to First Amendment jurisprudence for courts to misconstrue Garcetti. This court has had to correct the district courts, and this case cries out for that because what's happening here, with respect, Judge Shedd, I want to come right back to your point. It's about the kind of speech at issue. It's not about whether we're talking about what happens at work. The question here is was Dr. Chenoy employed to manage the hospital? No, he wasn't. And it's not a question of whether this was an official committee of the hospital that he chaired. He did, but it wasn't his official duty to make the observation. And, I mean, the suggestion that this is conduct is ludicrous because all of their affidavits before the district court make plain it's not about whether his veins were bulging out of his head or whatever kind of cartoonish sort of characterization they can employ. They didn't like what he had to say because management wasn't doing its job to be a part of the solution to the problem. Wait a minute. Apparently, once he thought about it, he didn't much care for the way he said it himself, did he? Well, but here's what his other doctors. It's not just about his affidavit. And this suggestion that the record here is all about conclusory allegations by Dr. Chenoy. Every medical professional. Wait, wait, wait. This is not a jury up here. I understand. I appreciate that. I give my best shot to you. Oh, I bet you do, and I can see that you do. And that's what I want to do in this case. Well, you know what? You may not get there unless you give me a chance to ask a question to help you. Maybe. I understand. Maybe that's sort of how the system works, and I know you know it. I do. I know you're caught up in it, and I can see. You're looking at three, but you see 12. I see. I know what's going on. But the point is, I'm going to suggest to you. I'm just suggesting. I understand. And it's good to feel strongly about your cases. That there is some component of conduct in this. I'm just suggesting whether or not it carries in the case for anybody. I don't know. But he apologized for his conduct, didn't he? Absolutely. Absolutely, because he's a gentleman. He is a gentleman. Did I suggest that he wasn't a gentleman? No, sir. This is a legal question about the point of conduct, which I raised and you're responding to. Exactly. That's all I'm saying. And what I'm saying to your Honor is, every other medical professional who observed the meeting disagrees, as a matter of fact, about whether what the hospital administrative people perceived was in fact what happened at that meeting. So when we talk about disputed questions of fact for a jury, with respect, I would say that this is not some one-sided record that made it easy for the judge to decide this question as some kind of laydown hand. These are matters that are disputed. And what you have here is the doctors and all the medical professionals who do the doctoring and have a component and bear responsibility for their piece of what happens in the hospital, saying that Dr. Chinoy is the conscience of the hospital. He's saying, guys, we're not doing this well to have four sentinel events within a period of a couple of months. We all need to get our arms around this and improve it. Tell me in two sentences the key to your argument then is it's what he was talking about, not the place where he was saying it. What is the key to your argument? The key to the argument is he was not employed as his duty to speak on that subject. It was not a part of his official duty. It may have been an official committee. All right. But when he moves over from talking about the doctors. The argument is it was not in his job description. Exactly. And what they're trying to do with Garcetti, I would argue, too, with respect, Your Honor, what they're trying to do with Garcetti is talk about work, no sweat, slam dunk, we're done with this. And what Garcetti says, it's much more nuanced than that. It's the nature and quality of the speech. And I would tell you that I don't see the speech here with Dr. Shinoy with respect in response to what counsel said. These men are not his superiors. These are all guys that are colleagues. The doctors do the doctoring. The administrators do the administering, right? Similar situation with teachers, both in the secondary education, Pickering, Adams post-secondary, right? People do different things. They should have the right to talk about things that aren't their responsibility because the Supreme Court and this court have told us that people like that are well positioned to know what's wrong and how to fix things. And I don't think we want the First Amendment law applicable to the medical profession. Would your client have spoken publicly about these things? He couldn't have. I mean, it's not possible to suggest that he could have given his obligations, as Judge Goodwin has noted, given his obligations to keep things confidential, how are you going to do that in an efficacious way? If he had information going into the meeting that he takes into the meeting that he's learned in a non-confidential way, he takes it into the—he can't speak about that? Now, if he knows of a problem at that hospital that he's learned independently, he may not speak about that anywhere other than in that meeting? Well, he can't speak effectively about it because he's limited by certain kinds of— Let me say this, you said effectively. I didn't say effectively, I said he can't speak about it. He couldn't go to a public forum on health care and say, well, I'll tell you the problems we have at this hospital. Could he do that? Sure he could. Okay. But that's not going to be enough to solve the problem, I would contend, and I would certainly suggest that this speech and this type of speech about how to make our hospitals safer is at least the equal of the speech protected in Pickering or in Adams. As to the other points that were made, we would certainly rest on our briefs, and I really appreciate your indulgence, and if I fail to understand you, I apologize for that. It won't be the first time somebody has. Amen. Thank you. Thank you. Thank you very much. We'll adjourn court, step down, greet counsel, and then thank them for their appearances. This honorable court stands adjourned, sign and die. God save the United States and this honorable court.
judges: Dennis W. Shedd, Henry F. Floyd, Joseph R. Goodwin